UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CHRISTINA MARIE BRADY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:16CV1173 ACL |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Plaintiff Christina Marie Brady brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration ("SSA") Commissioner's decision, following continuing disability review finding that she was no longer entitled to previously-granted disability benefits under Titles II and XVI of the Social Security Act. This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

### I. Procedural History

On September 22, 2009, Brady was found disabled beginning May 15, 2008, under the applications for disability benefits that she filed on April 11, 2008. (Tr. 65-71.) The ALJ noted that medical improvement was "expected with appropriate treatment." (Tr. 70.) Consequently, the ALJ recommended a continuing disability review in one year. *Id.*

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

On December 23, 2013, the SSA reviewed Brady's claim for continuing disability, and concluded that Brady was no longer disabled as of December 15, 2013. (Tr. 96-100.) Brady appealed the termination of benefits, and the termination was affirmed upon reconsideration. (Tr. 104-115.) On January 30, 2015, following a hearing, an ALJ found that Brown's disability ended on December 15, 2013, due to medical improvement. (Tr. 14-27.) On May 18, 2016, the Appeals Council denied Brady's request for review of the ALJ's decision. (Tr. 1-3, 6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

In the instant action, Brady argues that the ALJ "failed to fully and fairly develop the record." (Doc. 17 at 3.)

## II.  The ALJ's Determination

The ALJ made the following findings:

1. The most recent favorable medical decision finding that the claimant was disabled is the decision dated September 22, 2009. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairments: degenerative disc disease of the lumbar spine, shoulder pain, obesity, dysthymic disorder, hypochondriasis and a personality disorder. These impairments were found to result in the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is unable to do any prolonged sitting, standing or walking. She may occasionally reach, push, pull, balance or climb ladders or scaffolds. She should avoid all exposure to unprotected heights and moving mechanical parts. Finally, she would be limited to performing simple routine tasks in a low-stress environment with limited interaction with supervisors and co-workers.

3. Through December 15, 2013, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 CFR 404.1594(f)(1)).

4. The medical evidence establishes that, as of December 15, 2013, the claimant had the following medically determinable impairments: tendonitis of left shoulder and bilateral ankles, obesity, and depression.

5. Since December 15, 2013, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

6. Medical improvement occurred as of December 15, 2013 (20 CFR 404.1594(b)(1)).

7. As of December 15, 2013, the impairments present at the time of the CPD had decreased in medical severity to the point where the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can frequently reach overhead with both upper extremities.

8. The claimant's medical improvement is related to the ability to work because it resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(c)(3)(ii)).

9. As of December 15, 2013, the claimant continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(6)).

10. Based on the impairments present as of December 15, 2013, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can (1) stand, sit and walk for four hours at a time and 8 hours in a workday, each; (2) frequently reach overhead with both upper extremities, and has no other limitations with regards to her upper extremities; (3) frequently climb stairs, ramps, ladders, and scaffolds, and she can frequently crawl; (4) have occasional exposure to unprotected heights; and (5) tolerate frequent exposure to moving mechanical parts. Further, she can (1) understand, remember, and carry out simple instructions; (2) have occasional interaction with supervisors, co-workers, and the public; and (3) make simple, work-related decisions, and tolerate occasional change in work location.

11. As of December 15, 2013, the claimant was unable to perform past relevant work (20 CFR 404.1565).

12. On December 15, 2013, the claimant was a younger individual age 18-49 (20 CFR 404.1563).

13. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

14. Beginning on December 15, 2013, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

15. As of December 15, 2013, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of December 15, 2013,the claimant was able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

16. The claimant's disability ended as of December 15, 2013 (20 CFR 404.1594(f)(8)).

(Tr. 16-26).

The ALJ's final decision reads as follows:

The claimant's disability under sections 216(i) and 223(f) of the Social Security Act ended as of December 15, 2013.

(Tr. 27.)

### III. Statutory Framework and Standard of Review

Once an individual becomes entitled to disability and SSI benefits, her continued entitlement to benefits must be reviewed periodically. 42 U.S.C. § 423(f)(1); 20 C.F.R. §§ 404.1594(f), 416.949(a). If there has been medical improvement related to the claimant's ability to work, and the claimant is able to engage in substantial gainful activity, then a finding of not disabled will be appropriate. *Id.; Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991). The "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. *Delph v. Astrue*, 538 F.3d 940, 945-46 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 1999 (2009)).

The Eighth Circuit has articulated the burden in this type of case as follows:

> The claimant in a disability benefits case has a 'continuing burden' to demonstrate that he is disabled, *Mathews v. Eldridge*, 424 U.S. 319, 336, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and no inference is to be drawn from the fact that the individual has previously been granted benefits. 42 U.S.C. § 423(f). Once the claimant meets this initial responsibility, however, the burden shifts to the Secretary to demonstrate that the claimant is not disabled. *Lewis v. Heckler*, 808 F.2d 1293, 1297 (8th Cir. 1987). If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work. 20 C.F.R. § 404.1594(b)(2)-(5).

*Nelson*, 946 F.2d at 1315-16.

The continuing disability review process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f), pursuant to which the Commissioner must determine the following:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Delph*, 538 F.3d at 945-46.

The regulations define medical improvement as:

> [A]ny decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(I).

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's findings are supported by substantial evidence. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Cruse v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record *de novo*. *Id.* at 1328 (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is

supported by substantial evidence. *Id.* at 1320; *Clark v. Chater*, 75 F.3d 414, 416-17 (8th Cir. 1996).

### IV. Discussion

In her single claim, Brady argues that the ALJ failed to fully and fairly develop the record. Specifically, Brady contends that the ALJ failed to obtain the treatment records or notes from Brady's therapist, Debbie Gegg, MSW, LCSW.

It is well settled that "the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004). That duty is heightened where, as here, the claimant is not represented by counsel. *See Reeder v. Apfel,* 214 F.3d 984, 987 (8th Cir. 2000). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." *Nader v. Shalala,* 22 F.3d 186, 189 (8th Cir. 1994). However, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Id.; Haley v. Massanari,* 258 F.3d 742, 749-50 (8th Cir. 2001). "There is no bright line indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue,* 545 F.3d 634, 639 (8th Cir. 2008). Reversal due to failure to develop the record is only warranted when such failure is unfair or prejudicial. *Onstad v. Shalala,* 999 F.2d 1232, 1234 (8th Cir. 1993).

Ms. Gegg authored a letter on March 25, 2014, in which she indicated that she had been seeing Brady for mental health therapy since January 5, 2013. (Tr. 591.) Ms. Gegg stated that she saw Brady every other week to "work on her issues with depression and also anxiety due to marital problems as well as trying to deal with her physical disabilities and chronic pain." *Id.*

She stated that Brady "continues to make strides towards her goals of increasing her communication skills, decreasing depression and anxiety symptoms and working on stabilizing her marriage," although she "still has not fully met her goals and her mental health issues continue to interfere with her ability to live her life in a completely healthy way." *Id.* Ms. Gegg recommended that Brady continue with therapy "at least for the next several months," so that goals could be met. *Id.* In an addendum dated September 16, 2014, Ms. Gegg indicated that Brady continued to see her every other week to work on reaching her goals. *Id.* She stated that Brady started taking Cymbalta[2] for depression two weeks prior. *Id.* Ms. Gegg further stated that Brady's marriage had failed since her previous narration, and that Brady was "struggling with that setback." *Id.* She continued that Brady "expresses feelings of increased anxiety and frustration with her personal situation and how to handle those feelings." *Id.* Ms. Gegg noted that she had not yet been contacted by any agency regarding her previous statement and invited contact if there were any questions. *Id.*

The ALJ recognized that Brady had been seeing Ms. Gegg for therapy since January 5, 2013, but stated that the "record does not contain treatment records or notes from Ms. G[]egg." (Tr. 22.) The ALJ also discussed Ms. Gegg's March 2014 opinion. (Tr. 24.) She again noted that lack of treatment notes, and further found that her statement about "the claimant's mental health issues interfering with her life is vague." *Id.* The ALJ concluded that Ms. Gegg's opinion was entitled to "little weight." *Id.*

At the administrative hearing, Brady, who was unrepresented at the time, testified that she was seeing Ms. Gegg every other week for therapy. (Tr. 43.) The ALJ remarked, "We can update those records as well." *Id.*

---

[2] Cymbalta is an antidepressant drug indicated for the treatment of depression. *See Physician's Desk Reference ("PDR")*, S-234 (71st ed. 2017).

Defendant acknowledges that, "for whatever reason, by the time the ALJ was ready to make her decision in this case, Ms. Gegg's counseling notes were not in the record." (Doc. 20 at p. 6.) Defendant contends that the ALJ's failure to obtain Ms. Gegg's records was not prejudicial, as the ALJ had sufficient evidence with which to make a decision. Brady argues that the opinion of Ms. Gegg, as an "other source," was necessary to determine the severity of her mental impairment.

"[T]here are three major distinctions between acceptable medical sources and other[ sources]: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, (2) only acceptable medical sources can provide medical opinions, and (3) only acceptable medical sources can be considered treating sources." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citations omitted). "Other sources" include medical sources such as nurse practitioners, physician assistants, chiropractors, and licensed clinical social workers or therapists. *Id.*

While these other sources cannot establish the existence of a medically determinable impairment, information from such sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03P at *2. *See also Nowling v. Colvin*, 813 F.3d 1110, 1123-24 (8th Cir. 2016). "Evidence provided by 'other sources' must be considered by the ALJ; however, the ALJ is permitted to discount such evidence if it is inconsistent with the evidence in the record." *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015); *see also Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (in determining what weight to give to other evidence, the ALJ has more discretion and is permitted to consider any inconsistencies found within the record).

The ALJ considered Ms. Gegg's opinion, but found that it was vague and accorded it little

weight.  The ALJ also considered the opinions of the following medical sources in evaluating Brady's mental impairments: treating internist Carolyn Jachna, M.D.; consultative psychologist Alison Burner, M.A.; and state agency consultants Sherry Bassi, Ph.D., and Marsha Toll, Psy.D. (Tr. 20-22, 24.)  The ALJ stated that Brady reported a worsening of her depression symptoms to Dr. Jachna in February 2014.  (Tr. 20, 572.)  Dr. Jachna noted symptoms of depressed mood, decreased appetite, difficulty sleeping, and diminished interest in things she typically enjoys; and increased anxiety at times.  *Id.*  Brady reported that she was having relationship problems, which caused the worsening symptoms.  (Tr. 572.)  She also indicated that she was seeing counselors for the symptoms.  *Id.*  Upon examination, Brady was not anxious, her mood and affect were appropriate, her insight and judgment were normal, and she did not exhibit suicidal ideation.  (Tr. 576.)  Dr. Jachna prescribed Lexapro[3] for Brady's depression.  (Tr. 20-21, 574.)  The ALJ noted that, in April 2014, Brady reported an improvement of the initial depression symptoms with medication.  (Tr. 21, 577.)  Upon examination, Dr. Jachna noted Brady's mood and affect were appropriate.  (Tr. 579.)  She was instructed to follow up in three months.  *Id.*  The ALJ stated that the record indicates that Brady continued to take Lexapro.  (Tr. 21, 577, 580.)

The ALJ next discussed the findings of consultative psychologist Alison Burner.  (Tr. 21-22.)  Ms. Burner, a Licensed Psychologist, examined Brady on December 9, 2013, at the request of the state agency.  (Tr. 444.)  Brady reported that she was receiving disability benefits at that time because of degenerative disc disease and chronic pain.  *Id.*  She believed that the psychological evaluation was unnecessary, and was based on a mistaken belief that she was working cleaning houses.  *Id.*  Brady's psychiatric history was negative for hospitalization.  (Tr. 445.)  She reported that she had been seeing a therapist regularly for about a year.  *Id.*  Brady

---

[3] Lexapro is an antidepressant drug indicated for the treatment of depression.  *See PDR* at S-504.

was unaware of any official psychiatric diagnosis, but indicated that she started going to therapy because she was feeling "too sad" and thought she might be depressed. *Id.* She reported that the therapy was helpful. *Id.* Upon mental status exam, Brady was cooperative, her affect was appropriate, her speech was clear, she had good social skills, there was no evidence of perceptual disturbance, her thought content was rational and organized, her memory was intact, her abstract thinking was normal, her insight and judgment were average, and her attention and concentration were adequate. (Tr. 445-46.) Brady denied all significant mental health issues and reported that her claim was medical in nature. (Tr. 445.) When Ms. Burner questioned her about her allegation of symptoms of depression, Brady responded: "I don't know. I get frustrated and angry a lot because of my pain, I have no tolerance." *Id.* Ms. Burner stated that Brady did not note any symptoms of clinical depression and, when given a list, she did not endorse any of the symptoms. *Id.* As to Brady's activities of daily living, Ms. Burner stated that Brady was able to care for her daily needs adequately; was able to shop, cook, clean, pay bills, and do laundry; but was limited by her medical issues and chronic pain. (Tr. 446.) Ms. Burner stated that Brady reported no difficulty with social functioning, and indicated that she has friends. *Id.* Ms. Burner found that Brady had no psychiatric diagnosis. *Id.* She stated that Brady would not have difficulty interacting in a socially acceptable and appropriate manner in work situations with employers or coworkers due to psychological issues. *Id.*

The ALJ also discussed the opinions of the state agency psychologists. On December 18, 2013, Sherry Bassi, Ph.D., completed a Psychiatric Review Technique, in which she found that Brady had no medically determinable impairment. (Tr. 464.) Marsha Toll, Psy.D., also found that Brady had no medically determinable impairment in a March 2014 Psychiatric Review Technique. (Tr. 489.) The ALJ stated that these opinions are consistent with Ms. Burner's

December 2013 report. (Tr. 24.) The ALJ, however, noted that Brady began complaining of worsening symptoms of depression to Dr. Jachna in February 2014, and was prescribed medication to treat her depression at that time. *Id.* The ALJ stated that Brady's depression has responded to therapy and medication. She indicated that she was assigning little weight to the opinions of the state agency consultants. *Id.*

The undersigned finds that Brady was not prejudiced by the ALJ's failure to obtain the treatment notes of Ms. Gegg. The ALJ found that Brady's condition improved as of December 15, 2013, such that she no longer had severe hypochondriasis or a personality disorder, but her depression continued to be a severe impairment. (Tr. 16.) The mental RFC assessed by the ALJ did not change significantly from the previous decision. The prior favorable decision found that Brady was limited to performing "simple, routine tasks in a low-stress environment with limited interaction with supervisors and co-workers," whereas the ALJ found that, after December 15, 2013, Brady was limited to "occasional interaction with supervisors, co-workers, and the public;" and could "make simple, work-related decisions, and tolerate occasional change in work location." (Tr. 16, 19.)

Substantial evidence in the record exists from which the ALJ could make a determination regarding the severity of Brady's mental impairments. The following evidence discussed by the ALJ supports her determination that Brady's depression was not disabling: (1) Brady's testimony at the August 2014 administrative hearing that she was unable to work due to problems with her back, right knee, shoulders, and feet, rather than any mental impairment; (2) Brady's reports to Ms. Burner that she did not experience any significant mental health issues, and that that her disability was medical in nature; (3) Ms. Burner's conclusion that Brady's mental status examination was within normal limits, and findings that Brady was able to care for her daily needs, perform

significant daily activities, and had no difficulty with social functioning; (4) the state agency psychologists' opinions, based primarily on Ms. Burner's report, that Brady had no medically determinable impairment; and (5) Dr. Jachna's treatment notes revealing Brady's complaints of increased depression secondary to relationship problems decreased with medication management.

Notably, Brady has not submitted Ms. Gegg's treatment notes nor has she otherwise informed the Court of their significance despite being represented by counsel at the Appeals Council stage and in the instant action. *See Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) ("[I]t is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about.").

Further, Ms. Gegg's statement that Brady continued to work on her depression and anxiety due to marital problems, and that she still had not "fully met her goals and her mental health issues continue to interfere with her ability to live her life in a completely healthy way" is not inconsistent with the ALJ's determination. As previously discussed, the ALJ recognized that Brady continued to suffer from depression, and consequently limited her to simple work, with only occasional changes in work location and occasional interaction with supervisors, co-workers, and the public. Although it is unclear what efforts, if any, the ALJ undertook to obtain Ms. Gegg's treatment notes, Brady has not shown that she was prejudiced by this error.

Brady next briefly argues that the ALJ "also failed to fully and fairly develop the record by failing to request a copy of the video tape from the Officer of Inspector General, CDI Investigators." (Doc. 17 at 7.)

At some point during the continuing disability review, the Missouri Disability Determination Section ("DDS") requested that the Commissioner's Office of Inspector General ("OIG") commence an investigation of Brady. On December 9, 2013, Thomas Brady, a Special

Agent of the OIG, followed and observed Ms. Brady as part of this investigation. (Tr. 454.) Agent Brady detailed his findings in a report titled "Summary Report of Investigation, Cooperative Disability Investigations Unit, St. Louis CDI." (Tr. 450-58.) Agent Brady reported that he observed Ms. Brady leaving her home, walking down the partially snow-covered brick sidewalk, entering her Jeep, and exiting her vehicle without difficulty. (Tr. 454.) He stated that he next observed Ms. Brady walk to and from a doctor's office without difficulty, and then walk into a lounge and socialize with the bartender. *Id.* at 454-55. Agent Brady subsequently interviewed Ms. Brady at her home, where she reported that she was able to care for herself; drive; shop frequently, to reduce the number of packages she has to carry; and socialize outside the home about once every two weeks. (Tr. 455.) She stated that she was limited on what she could do physically, and was taking yoga classes at that time. (Tr. 456.) Agent Brady concluded that, based on his observations, Ms. Brady did not appear to suffer any obvious physical limitations. (Tr. 456.) He indicated that a surveillance video from his observations of Ms. Brady on December 9, 2013 would be made available upon request. (Tr. 457.)

The ALJ summarized Agent Brady's report, and noted that the report could be considered, with all the other evidence, to assess the severity of Brady's impairments as well as Brady's credibility. (Tr. 22.)

Brady argues that the ALJ erred in relying on the CDI investigator's written report rather than the video itself. She specifically objects to the investigator's statement that "Medical and even lay evidence from the claimant herself show she appears to be more functional than one would expect from a person who alleges severe back and shoulder pain." (Tr. 460.)

Brady's argument lacks merit. The statement to which she refers was included at the beginning of the CDI report in a section titled "Nature of Referral." (Tr. 451.) As such, the

statement was merely explaining the basis for the referral to the CDI for investigation. The ALJ did not cite the statement in her opinion, and there is no evidence that she relied on that statement.

Brady offers no support for her contention that the ALJ erred in considering the statements contained in the CDI report. The ALJ properly considered Agent Brady's report as one of many factors in assessing Brady's credibility and in determining her RFC. *See* SSR 96-7p (in determining claimant's credibility, ALJ must include the entire case record, including claimant's own statements and "any other relevant evidence in the case record"); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (determination of RFC based on all the evidence in the record, including the "observations of treating physicians and others, and an individual's own description of his limitations"); *see also Graffis v. Colvin*, No. 4:14 CV 1486 SNLJ(JMB), 2015 WL 5098776 (E.D. Mo. Aug. 11, 2015) (finding ALJ properly considered entire record, including "evidence offered by the CDI investigator" in determining claimant's RFC).

In sum, the ALJ was not required to further develop the record either by obtaining Ms. Gegg's treatment notes or the surveillance video, because substantial evidence supports her determination that Brady's condition medically improved. Significantly, although Brady reported to the ALJ and to Ms. Burner that she was disabled due to her physical impairments, she does not directly challenge the ALJ's findings regarding her physical condition, other than objecting to the ALJ's failure to obtain the surveillance video.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of September, 2017.